TELEMUNDO OF LOS ANGELES,
et al., Plaintiffs,

v.

THE CITY OF LOS ANGELES,
et al., Defendants.

No. CV 03–6288ABC(JTLX).

United States District Court,
C.D. California.

Sept. 10, 2003.

Theodore Boutrous, Greg Brown, William Thomson, Gibson Dunn & Crutcher, Los Angeles, CA, for Plaintiffs.

Michael Claessens, Laurie Rittenberg, Los Angeles City Attorney's Office, Los Angeles, CA, for Defendants.

Richard Simon, Matthew Oster, McDermott Will & Emery, Los Angeles, CA, for Intervenor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF PRELIMINARY INJUNCTION GRANTED TO PLAINTIFFS

COLLINS, District Judge.

Plaintiffs' Application for a Preliminary Injunction (the "Application") came on regularly for hearing before this Court on September 10, 2003. After reviewing the materials submitted by the parties, argument of counsel, and the case file, the Court hereby makes the following findings of fact and conclusions of law:

### I. FINDINGS OF FACT

1. On September 15, 2003, the City of Los Angeles is scheduled to hold an official ceremony and celebration at City Hall Plaza to commemorate the 193rd anniversary of the beginning of the Mexican War of Independence against colonial Spain, known as the tradition of "El Grito" (The Cry). *See* Declaration of Monica Gil ("Gil Decl.") ¶ 2; Ex Parte Application, Exh. B.

2. The El Grito ceremony commemorates a Mexican tradition that dates back

to 1810, when Father Miguel Hidalgo y Costilla gave the cry that initiated the events that culminated in the war for independence from Spain. *Id.*

3. Univision Television Group, Inc., d.b.a. KMEX–TV ("KMEX") originated the concept of the celebration and has produced and broadcast the celebration exclusively for the past 22 years. *See* Declaration of Christina Sanchez Camino ("Camino Decl.") ¶ 7.

4. In planning each year's celebration, KMEX has worked with the Comite Mexicano Civico Patriotico ("Comite"), a private civic organization, the Mexican Consulate, the City of Los Angeles, and interested members of the Los Angeles City Council. *See* KMEX Opp'n at 1:18–21; Camino Decl., Exh. E.; Gil Decl, Exh. B. .

5. The El Grito celebration is scheduled to begin with a live concert given by Latin performers, and will culminate with an official ceremony on the steps of City Hall, featuring a reenactment of the historic cry by the Los Angeles Mexican Consul General and involving appearances by the Mayor, the City Attorney, Councilmember Alex Padilla and other City officials. *See* Gil Decl. ¶ 2.

6. The celebration and ceremony will last one hour and will be broadcast nationwide on KMEX's affiliated network, Univision. *See* Camino Decl. ¶ 12.

7. The broadcast can be divided into two portions: the first 45 minutes will be purely entertainment and the last 15 minutes will comprise the actual reenactment of El Grito De Delores. *Id.* ¶ 13.

8. Because of scheduling conflicts, KMEX will delay its broadcast by one hour. *Id.*

9. KMEX intends to provide news outlets access to the same video feed of the reenactment that it is sending to its affiliated networks. That feed will be distributed by Telco line and will be clean of any logos, network or station branding, or other advertising. *Id.* ¶ 16.

10. KMEX has placed certain common restrictions on use of the pool feed. Specifically, because KMEX's affiliated networks must broadcast the celebration on one-hour tape delay, no news organization may "scoop" KMEX's affiliated networks. Simultaneous broadcasting is permitted. *Id.*

11. For the past four months, Plaintiffs Telemundo of Los Angeles, Inc. and Estrella Communications, Inc. (collectively, "Telemundo") have attempted to secure from the City equal access to the El Grito ceremony for its journalists and news technicians. *See* Gil Decl. ¶ 5.

12. Telemundo's Director of Public Affairs, Monica Gil, called City Council President Padilla's office in May 2003, seeking equal access to El Grito. His staff was unwilling to talk about El Grito and directed Ms. Gil to other staff members who did not return her calls. In June, one of Council President Padilla's staff members told Ms. Gil that she would have to wait until the new council members were seated in July 2003 to discuss Telemundo's participation in El Grito. *Id.*

13. Ms. Gil called Council President Padilla's office on July 1, 2003 to follow up. *Id.*

14. On July 10, 2003, Ms. Gil heard back from Council President Padilla's staff via electronic mail, but the response did not address her request to participate in the El Grito production meetings. *Id.* ¶ 6.

15. On July 21, 2003, Mr. Abud and Ms. Madison of Telemundo sent a letter to Council President Padilla stating that Telemundo wanted to participate in the El Grito ceremony on equal footing with Univision. *Id.* ¶ 7, Exh. A.

16. On August 1, 2003, Council President Padilla responded by letter stating that such participation would not be possible because the City had "partnered" with Univision, and Univision had a financial interest in participating in the event with "exclusive rights to broadcast from the stage." *Id.*, Exh. B.

17. On August 6, 2003, Paula Madision, Manuel Abud, James Lichtman and Ms. Gil met with Council President Padilla, Los Angeles City Attorney Rocky Delgadillo, and members of their staffs to discuss the El Grito celebration. *Id.*

18. Throughout July and August 2003, Ms. Gil continued to call Council President Padilla's office approximately three times each week to discuss access, but his staff members did not return her calls. *Id.*

19. A July 8, 2003 letter from Mayor Hahn states that the El Grito event is part of the City's Latino Heritage Month 2003, and is being "organized by Council President Alex Padilla." *See* Plfs' Reply, Exh. A.

20. For at least the last three years, the City Council has declared the El Grito celebration a Special Event sponsored by the City and has requested that all City Departments waive all fees, costs, and requirements, including insurance. *See* Pls' Reply, Exh. C.

21. On September 2, 2003, the City Council authorized that "$75,000 be transferred from the General City Purposes Fund ... to support the El Grito celebration," and that a total of $20,000 be designated for cultural events from the Cultural Affairs Department to support the event. *Id.*

22. On August 19, 2003, Council President Padilla wrote to Telemundo, explaining that the City was "only a co-sponsor of the El Grito celebration" and Univision controlled "all production aspects." Ex Parte Application, Exh. D.

23. On September 3, 2003, Telemundo filed a Complaint and an Ex Parte Application for a Temporary Restraining Order and an Order to Show Cause why a preliminary injunction should not issue. The Complaint named the City of Los Angeles and Council President Alex Padilla as Defendants.

24. Telemundo seeks to broadcast the last 15 minutes of the El Grito event, the actual reenactment of El Grito De Delores.

25. The Court received Defendants' Opposition to the Application on September 5, 2003.

26. On September 5, 2003, the Court granted a Temporary Restraining Order.

27. Thereafter, KMEX filed an Ex Parte Application to Intervene and an Opposition to Plaintiffs' Application on September 5, 2003.

28. On September 8, 2003, the Court received: (1) Telemundo's Opposition to the Application to Intervene, (2) Defendants' Response to the Order to Show Cause, and (3) KMEX's Supplemental Brief.

29. The Court granted the Application to Intervene on September 8, 2003.

30. The Court received Telemundo's Reply on September 9, 2003.

31. Any conclusion of law deemed to be a finding of fact is hereby incorporated into the findings of fact.

## II. CONCLUSIONS OF LAW

1. To obtain a preliminary injunction, a plaintiff must show "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL*

*Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id.* (internal quotations omitted). "Thus, the greater the relative hardship to [a plaintiff], the less probability of success must be shown." *Id.*

2. Telemundo's Complaint asserts causes of action against the City of Los Angeles and Alex Padilla in his official capacity as member and President of the Los Angeles City Council. Telemundo alleges violations of its (1) right to free speech and free press under the First Amendment, made applicable to the states under the Fourteenth Amendment of the United States Constitution; (2) right to equal protection and due process under the Fifth and Fourteenth Amendments; and (3) right to free speech and press under Article I of the California Constitution.

3. The Court finds that Telemundo has established a likelihood of success on its free speech claim under the First Amendment.

■ 4. Freedom of the press and of speech as guaranteed by the First Amendment is within the "liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action." *Near v. Minnesota,* 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

■ 5. As an initial matter, the Court concludes that there is undoubtedly state action involved in the El Grito ceremony. A city may be held liable under 42 U.S.C. § 1983 for violation of the First Amendment if the acts in question were undertaken pursuant to official policy or custom. *Hopper v. City of Pasco,* 241 F.3d 1067, 1082 (9th Cir.2001) (citing *Monell v. Dep't of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

■ 6. There are three ways to meet the policy or custom requirement: (1) the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal government policy or a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) the plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official government policy; and (3) the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Id.* at 1083 (citations omitted).

■ 7. The record is replete with evidence to support all three avenues for establishing that the City's alleged denial of equal access to the El Grito ceremony was committed as part of a formal policy or custom.

8. First, Telemundo has presented evidence to show that the City has a longstanding practice of sponsoring the El Grito ceremony and partnering exclusively with Univision to broadcast the event. As Council President Padilla acknowledged, the City is a co-sponsor of the El Grito ceremony and has "partnered" with Univision and others for the production of the ceremony. The event is occurring at City Hall and will include appearances by Mayor Hahn, Council President Padilla, and other high-ranking City officials. Minutes from City Council sessions from the last three years also indicate that the El Grito celebration is an event sponsored by the City.

9. Second, Telemundo may likely show that Council President Padilla committed the constitutional tort and that he is an

official with "final policy-making authority."

10. Third, if Padilla were not deemed a final policymaker, Telemundo has presented evidence to support a finding that final policymakers ratified Padilla's decision to deny Telemundo equal access to the El Grito ceremony. A July 8, 2003 letter from Mayor Hahn states that the El Grito event is part of the City's Latino Heritage Month, and is being "organized by Council President Alex Padilla."

11. Despite substantial evidence to the contrary, KMEX contends that there is no state action in this case. For support, KMEX cites *Crowder v. Conlan*, 740 F.2d 447 (6th Cir.1984) and *Jackson v. Statler Found.*, 496 F.2d 623 (2d Cir.1973). Neither of these cases is relevant to the facts before the Court. These cases deal with the circumstances in which private entities may be deemed state actors for purposes of imposing liability under § 1983. By contrast, the Court is concerned with the circumstances in which a state actor may be held liable under § 1983. As discussed above, a proper inquiry focuses on whether the alleged constitutional violation was undertaken pursuant to the City's official policy or custom. KMEX's argument is therefore baseless.

12. Because state action is present, the Court turns to whether the City has likely abridged Plaintiffs' rights under the First Amendment.

13. In *Richmond Newspapers, Inc. v. Virginia*, the Supreme Court broke new ground by recognizing that the First Amendment gave the press and public an affirmative right of access to newsworthy matters, particularly criminal court proceedings. 448 U.S. 555, 578–82, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) ("Until today the Court has accorded virtually absolute protection to the dissemination of information or ideas, but never before has it squarely held that the acquisition of newsworthy matter is entitled to any constitutional protection whatsoever ... Today, however, for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgement of the freedoms of speech and of the press protected by the First Amendment.") (Stevens, J., concurring); *see* Eugene Cerruti, "Dancing in the Courthouse: The First Amendment Right of Access Opens a New Round," 29 U. RICH. L. REV. 237 (1995).

14. However, the presence of state action and Telemundo's invocation of the First Amendment is not dispositive of the issue. The rights granted to the press and embodied in the First Amendment are not absolute. *Richmond*, 448 U.S. at 581 n. 18, 100 S.Ct. 2814 ("[O]ur holding today does not mean that the First Amendment rights of the public and representatives of the press are absolute."); *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information.").

15. The Court must consider the character of the location where the expressive activity will occur. Whether the location is a public or nonpublic forum determines the extent to which First Amendment rights may be exercised and the amount of consideration courts must give governmental interests engendering restrictions on those rights. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

16. In *Perry*, the Supreme Court outlined three types of forums: (1) public forums are those places which traditionally have been held in the trust for the use of the public, such as streets, sidewalks and parks; (2) designated public forums are

nontraditional forums that the government has opened for expressive activity by part or all of the public; and (3) nonpublic forums include property which is not by tradition or designation a forum for public communication. 460 U.S. at 45–46, 103 S.Ct. 948.

17. If government property has by law or tradition been given status as a public forum, a state's right to limit protected expressive activity is sharply circumscribed. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). The government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are content-neutral, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information. *See id.; Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quotation marks and citations omitted).

18. The Court finds that the El Grito ceremony is a public forum. For at least three years, the entertainment and official ceremony have taken place on government property, transforming publicly owned property into a public forum for expressive activity. *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 570 (9th Cir.1984) ("[B]y granting Cinevision access to the Bowl for the presentation of music by a variety of performers, the City transformed publicly owned property into a public forum, even if the expressive activity is promoted by a single entity.").

19. Where the government is acting in its proprietary capacity (rather than governmental) with respect to public property, the government may restrict access to performances produced by private entities as long as the restrictions are not arbitrary and the event is purely commercial. *D'Amario v. Providence Civic Ctr. Auth.*, 639 F.Supp. 1538, 1544 (D.R.I.1986) (state may enforce "no camera" rule at rock concert); *Post Newsweek Stations–Connecticut, Inc. v. Travelers Ins. Co.*, 510 F.Supp. 81, 85–86 (D.Conn.1981) (state may restrict television station's access to figure-skating championships at civic center).

20. The Court finds that the City is not acting in its proprietary capacity with respect to the official ceremony portion (the last 15 minutes) of the El Grito event. This portion will feature Mayor Hahn, Council President Padilla and other City officials. In addition, the City is acting in its governmental capacity because for at least the last three years, the City Council has declared the El Grito celebration a Special Event sponsored by the City.

21. Next, the Court considers whether the City's restrictions on Telemundo's broadcast of the El Grito official ceremony are reasonable.

22. Several courts have determined that discriminatory access to public forums or information is generally violative of the First Amendment. *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir.1986) (district court could not grant one media entity access to discovery materials while excluding another); *American Broadcasting Companies v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir.1977) (ABC could not be excluded from post-election activities at campaign headquarters where other members of the press were granted access); *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C.Cir.1977) (where White House press facilities had been made publicly available as a source of information for reporters, the White House could not exclude a reporter arbi-

trarily or for less than compelling reasons); *United Teachers of Dade v. Stierheim,* 213 F.Supp.2d 1368, 1373–74 (S.D.Fl.2002) (teachers' union and editor of union newspaper could not be excluded from the press room reserved for members of the "general-circulation" media and relegated to a "separate but equal" media room); *Westinghouse Broadcasting Co., Inc. v. Dukakis,* 409 F.Supp. 895, 896 (D.Mass.1976) (public officials may not selectively exclude one news organization from public meetings and press conferences absent a compelling government interest); *Borreca v. Fasi,* 369 F.Supp. 906, 909–10 (D.Haw.1974) (enjoining mayor from excluding a certain reporter from general news conferences).

23. Defendants have not presented one reason, compelling or otherwise, why they initially decided that KMEX's cameras should be granted access to the official ceremony while Telemundo should be required to use a pool feed. However, now that the City has made the decision, it argues that the restrictions on Telemundo are required for public safety reasons pursuant to Los Angeles Fire Department Standard Policies and Procedures for outdoor concert events.

24. In reviewing the declaration of L.A. Fire Department Inspector Benjamin Flores, the Court did not find that he concluded that occupancy restrictions preclude Telemundo's cameras or trucks. Instead, Inspector Flores stated that he would approve cameras in front of the stage and would not approve "hand held roaming or stationary cameras in the audience area." Defs' Opp'n, Benjamin Flores Declaration ("Flores Decl.") ¶ 13. Flores did not offer an opinion as to cameras on stage. However, he will allow the broadcast media to park their production trucks in the southwest corner of "Lot 11" between Spring and Broadway. *Id.* ¶ 14.

25. Because the City's public safety considerations are not supported by the evidence, the Court finds that the City's restrictions on Telemundo's access to the official ceremony are unreasonable.

26. Telemundo has established a substantial likelihood of success on its First Amendment claim.

27. Because Plaintiffs have demonstrated such a substantial likelihood of success on the merits of their claims, they need only show a reasonable possibility of irreparable injury at this second step of the preliminary injunction test.

28. As Plaintiffs correctly note, the "Supreme Court has made clear that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance of a preliminary injunction." *Sammartano v. First Judicial District Court,* 303 F.3d 959, 973 (9th Cir. 2002) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

29. Defendants argue that Telemundo will not be irreparably harmed because it will be provided a pool feed of KMEX's broadcast.

30. The Court rejects Defendants' argument because embodied in Telemundo's First Amendment rights is its right to decide what to film, what to emphasize, and what images to relay to viewers. Moreover, Defendants have not persuasively argued that pooling is necessary.

31. The Court finds that Plaintiffs have made a sufficient showing of irreparable injury.

32. The Court also finds that equitable considerations do not weigh in favor of denying the preliminary injunction.

33. KMEX cites *WPIX, Inc. v. League of Women Voters,* 595 F.Supp. 1484

(S.D.N.Y.1984), in arguing that Telemundo's last-minute demand for access will unjustly burden KMEX with the task and expense of revising the stage and its production. KMEX also argues that, unlike Telemundo, it has invested money and resources in planning the El Grito ceremony.

34. The Court finds Telemundo's actions distinguishable from the *WPIX* plaintiff, which never informed the state actor that it demanded physical access to the event prior to commencing litigation for injunctive relief. Here, the record is clear that Telemundo sought access as early as May 21, 2003, almost four months before the event, when it raised the issue with Council President Padilla.

 35. Furthermore, KMEX's commercial interest in the production of the El Grito ceremony does not outweigh Telemundo's First Amendment rights and the public interest in diversity of coverage of newsworthy events.

36. For these reasons, Telemundo is not compelled to delay broadcasting the ceremony for one hour. The public has an interest in viewing live coverage of the event.

37. The Court now turns to the question of the appropriate interim remedy.

38. The Plaintiffs do not seek any remedy with respect to the entertainment portion of the event. As to the official ceremony, Plaintiffs seek (1) equal camera positioning; (2) equal number of cameras; (3) equal production truck positioning; (4) equal access to stage audio; (5) equal signage opportunity, or no signage at all; (6) equal emcee opportunity, co-emcee opportunity or no emcees; (7) equal "access" credentials; (8) equal access to production meetings; and (9) equal access to rehearsal meetings. *See* Amended [Proposed] Order Granting Preliminary Injunction.

39. Based on the foregoing, the Court GRANTS Plaintiffs' request for a preliminary injunction granting equal camera positioning, equal number of cameras, equal truck positioning, equal access to stage audio, equal "access" credentials, equal access to production meetings, and equal access to rehearsal meetings. The Court DENIES Plaintiffs' request for an equal emcee opportunity, co-emcee opportunity or no emcees.

40. Any finding of fact deemed to be a conclusion of law is hereby incorporated into the conclusions of law.

### III. PRELIMINARY INJUNCTION

Based on the foregoing, the Court hereby ORDERS as follows:

Defendants are ENJOINED from restricting Plaintiffs' right to broadcast the El Grito official ceremony as outlined in Conclusions of Law ¶ 39.

It is so ORDERED.