nessee and Wisconsin are dismissed for lack of standing.

**IT IS FURTHER ORDERED** that a Telephone Motion Hearing on Plaintiffs' Motion for Relief/Motion to Enjoin State Court Proceedings [doc. # 174] will be held on *October 3, 2007,* at *9:00 a.m.* Counsel for all interested parties shall notify chambers of the identity of counsel to participate in this hearing prior to the hearing date. The Court will initiate this telephone hearing with identified counsel on the date and time stated above.

So Ordered.

**J. AVALOS, individually and as a representative of the class defined hereinbelow, Plaintiff,**

v.

**Leroy BACA, Larry Waldie, Shaun Mathers, Defendants.**

**No. CV 05–07602 DDP SHX.**

United States District Court, C.D. California.

Aug. 24, 2007.

Edward F. Figaredo, Edward F. Figaredo Law Offices, El Monte, CA, Joseph Reichmann, Jr., Marion R. Yagman, Stephen Yagman, Yagman Yagman & Reichmann, Venice, CA, for Plaintiff.

Andrew Baum, Bryan M. Sullivan, Louis R. Miller, Christensen Glaser Fink Jacobs Weil & Shapiro, Los Angeles, CA, Daniel Lee, Justin W. Clark, Paul B. Beach, Franscell Strickland Roberts and Lawrence, Glendale, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DEAN D. PREGERSON, District Judge.

This motion comes before the Court on defendants' motion for summary judgment, or in the alternative, summary adjudication. After reviewing the materials submitted by the parties and upon hearing oral argument, the Court grants defendants' motion for summary judgment in its entirety and adopts the following order.

## I. BACKGROUND

Juan Avalos ("plaintiff"), as a representative of a putative class, brings this action against Sheriff Leroy Baca, Undersheriff Larry Waldie, and Lieutenant Shaun Mathers of the Los Angeles County Sheriff's Department ("defendants") alleging claims arising out of his 73–day over-detention in a Los Angeles County Jail facility. On June 22, 2004, plaintiff was arrested on an Orange County warrant for domestic abuse. Following his arrest, plaintiff was transported to Men's Central Jail ("MCJ"). However, the Orange County Sheriff's Department was never notified of plaintiff's arrest or presence in MCJ, and consequently never initiated any procedures to pick him up. The Los Angeles Sheriff's Department ("LASD") had the responsibility to notify the Orange County Sheriff's Department of plaintiff's arrest and detention in MCJ.

On September 4, 2004, LASD realized plaintiff had been over-detained and was entitled to be released. Defendants contend plaintiff was allowed to change into his personal clothes and was approached by Sergeant James Wilson, a member of LASD's Risk Management Bureau. (Wilson Decl. ¶¶ 4–5.) Defendants also contend that after Sergeant Wilson, who was wearing civilian clothing and was not carrying a weapon, realized that plaintiff did not speak English, enlisted a bilingual officer, Deputy Yvonne Zarate, to translate. (Wilson Decl. ¶¶ 6–7.) Defendants contend that Sgt. Wilson spoke with plaintiff through Deputy Zarate, and discovered that plaintiff earned $500 per week in his janitorial job prior to his incarceration. (Wilson Decl. ¶ 8.) Defendants assert that based upon this information, Sgt. Wilson proposed that plaintiff release all claims he had against LASD as a result of his over-detention in exchange for $500. (Wilson Decl. ¶ 8.) Defendants contend that plaintiff agreed, signed the paperwork, and was released from custody. (Wilson Decl. ¶ 10.)

Plaintiff, on the other hand, contends that he was given his personal clothes and brought into a room with one officer. (Avalos Dep. 39:1–5, 41:11–13.) Plaintiff also contends that he was not aware of what he was signing, but that he believed the papers related to his release from prison. (Avalos Dep. 41:6–7.) Plaintiff claims that he believed that he was being released because a friend had paid his bail. (Avalos Dep. 32:2–5.) Plaintiff denies that there was a translator present when he signed the waiver, (Avalos Dep. 41:11–13.), and denies telling the officer how much he made per week prior to his incarceration. (Avalos Dep. 45:20–23.)

Following his release, on September 9, 2004, two LASD officers visited plaintiff at his home to deliver his settlement payment. They arrived in an unmarked vehicle and wore civilian clothes. Defendants contend one of the officers translated a "Release and Settlement Agreement" for plaintiff to sign, and explained the material terms to plaintiff. (Lam Decl. ¶ 5.) Conversely, plaintiff contends that the officers called his house from the street and that his daughter answered the phone. (Avalos

Dep. 47:18–25.) Plaintiff further contends that he went outside alone to speak with them, and that they did not translate the release for him. (Avalos Dep. 53:2–18.)

On April 3, 2006, plaintiff filed his First Amended Complaint ("FAC") against defendants in their individual and official capacities. The FAC alleges four causes of action. In Count I, plaintiff alleges that defendants violated his Fourth and Fourteenth Amendment rights by causing him to be over-detained and by causing plaintiff to involuntarily waive his civil rights claim against defendants. (FAC ¶ 20.) In Count II, plaintiff alleges that defendants engaged in a conspiracy to cause plaintiff's over-detention and involuntary waiver of over-detention claim. (FAC ¶¶ 21–23.) In Count III, plaintiff alleges that defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(a)-(c). (FAC ¶¶ 24–52.) In Count IV, plaintiff alleges that defendants conspired to commit violations of 18 U.S.C. §§ 1962(b)-(d). (FAC ¶¶ 53–54).

Plaintiff also alleges that he represents a class of more than 100 members who share the following characteristics: (1) they were over-detained in the L.A. County Jail system; (2) their over-detentions were recognized by LASD officials; and (3) they were fraudulently, oppressively, extortionately, or with threats were duped into compromising their monetary claims for sums far less than those claims were worth.[1]

On September 1, 2006, plaintiff moved for summary adjudication on two issues. On October 16, 2006, the Court granted summary adjudication on each issue and determined that plaintiff was over-detained, and that defendants were potentially liable under the Prison Litigation Reform Act. On March 1, 2007, defendants filed this motion for summary judgment or in the alternative, summary adjudication as to all plaintiff's causes of action.

## II. LEGAL STANDARDS

### A. *Summary Judgment*

Summary judgment is appropriate if there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has no burden, however, to negate or disprove matters on which the non-moving party will have the burden of proof at trial. *Id.* at 325, 106 S.Ct. 2548. The moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case. *Id.*

The burden then shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence … will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Evidence that "is merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment. *Id.* at 249–50, 106 S.Ct. 2505.

---

1. To date, plaintiff has not moved for class certification. Therefore, the Court treats plaintiff's FAC as an individual suit against defendants.

■ Summary judgment cannot be granted where a genuine dispute exists as to any material fact. Fed.R.Civ.P. 56(c). A "material" fact is one which might affect the outcome of the case under the applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the non-moving party. *Id.* In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. 2505. Moreover, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment." *Id.*; *see Berry v. Baca,* 379 F.3d 764, 769 (9th Cir.2004).

### B. *Monell Standard*

■ Under § 1983 a public entity defendant cannot be held liable for a § 1983 violation caused by an individual employee's actions under a theory of respondeat superior. *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to be liable, the defendant must act as a "lawmaker[ ] or ... [one] whose edicts may fairly be said to represent official policy." *Id.* at 691, 98 S.Ct. 2018. Under *Monell,* municipal liability must be based upon enforcement of a municipal policy or custom that causes the deprivation of a plaintiff's federal right, and not upon the municipality's mere employment of a constitutional tortfeasor. *Id.* To maintain a § 1983 claim against a public entity defendant, or supervisors not personally involved in the alleged violation, a plaintiff must allege that his or her constitutional injury resulted from a policy, practice or custom of the local entity. *Id.*

■ There are three ways to meet the policy, practice, or custom requirement for municipal liability under § 1983:(1) the plaintiff may prove that a public entity employee committed the alleged constitutional violation pursuant to a formal policy or a longstanding practice or custom, which constitutes the standard operating procedure of the local government entity; (2) the plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official government policy; or (3) the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action. *Telemundo of Los Angeles v. City of Los Angeles,* 283 F.Supp.2d 1095, 1100 (C.D.Cal.2003) (citing *Hopper v. City of Pasco,* 241 F.3d 1067, 1083 (9th Cir.2001)). An unconstitutional policy need not be formal or written to create municipal liability under § 1983; however, it must be so permanent and well settled as to constitute a custom or usage with the force of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Furthermore, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

### III. DISCUSSION

### A. *Count I: Violation of Plaintiff's Fourth and Fourteenth Amendment Rights*

Plaintiff's first cause of action alleges, in pertinent part, that:

defendants engaged in conduct, including actionable omissions, as set forth above, that violated [plaintiff's] Fourth Amendment rights, and thereby and [sic] also violated the Fourteenth Amendment to the United States Constitution, and which also were deliberately indifferent to plaintiff's Fourteenth Amendment rights, and by virtue thereof, each defendant is liable to plaintiff for damages, either nominal or compensatory, according to proof.

(FAC ¶ 20.) It is unclear to the Court whether Count One of plaintiff's FAC alleges that plaintiff's Fourth and Fourteenth Amendment rights were violated as a result of his over-detention or as a result of his involuntary waiver of a civil rights claim for his over-detention. For ease of organization, the Court addresses each claim separately. Additionally, the Court addresses each of plaintiff's claims against defendants in both their individual and official capacities.

### 1. Over–Detention

#### a. Official Capacity Claim: Monell Liability

Plaintiff alleges that his Fourth and Fourteenth Amendment rights were violated as a result of his over-detention by defendants. In moving for summary judgment, defendants contend plaintiff has failed to prove that defendants have a policy, practice, or custom of over-detaining inmates under *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In particular, defendants argue that this Court's decision in *Mortimer v. Baca*, 478 F.Supp.2d 1171 (C.D.Cal.2007), granting summary judgment in favor of Sheriff Leroy Baca, forecloses plaintiff's over-detention claim because it held that the LASD did not maintain a policy, practice, or custom of over-detaining inmates during the

period in which Avalos was detained. *See Mortimer* 478 F.Supp.2d at 1178 (holding that "[a]s a matter of law, the Sheriff's implementation of policies since the *Vanke* injunction to effectuate 51,000 releases during the class period, of which 43 are potential over-detentions, is reasonable and cannot constitute a *Monell* deliberate indifference claim").

*Mortimer* involved a class including "all LASD detainees who were not released within twelve hours of either (a) the expiration of the applicable sentence or (b) a court-ordered release, and who have no outstanding releases, warrants, or holds," and was limited to the time period extending from November 23, 2002 to May 25, 2005. *See Mortimer*, 478 F.Supp.2d at 1172. In granting summary judgment, the Court found that LASD had released nearly 51,000 individuals during the class period and that only 43 were potential over-detentions. *Id.* at 1175–79. The Court also detailed the steps LASD had taken to reduce the number of over-detentions such as the "courthouse release program" and "early release program." *Id.* Finally, evaluating the statistical evidence presented by plaintiffs and defendants, the Court concluded that the numbers of over-detentions dramatically decreased between the years 1997 and 2004. *Id.* at 1179.

■ Here, as in *Mortimer*, the Court may grant summary judgment if defendants can show no triable issue of material fact exists with respect to the reasonableness of the Sheriff's implementation of the policies that resulted in Avalos' over-detention. *Id.* Plaintiff may only defeat summary judgment if he can distinguish this case from *Mortimer*. To do so, plaintiff must demonstrate "[e]vidence of ... custom [ ] by practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of

carrying out policy." *Id.* (citing *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996)).

In determining whether or not LASD maintains an unconstitutional policy, practice or custom of over-detention, the Court first considers the frequency with which over-detentions have occurred. *See Trevino*, 99 F.3d at 918. In opposition to defendants' motion for summary judgment, plaintiff presents copies of excerpts from over-detention packets produced under seal by the Sheriff for the years 2000 to 2005, originally produced in the *Mortimer* litigation. (*See* Pl.'s Exs. 1–6.)[2] The evidence indicates that between 2000 and 2005 there were 459 over-detentions[3] resulting in settled claims as compared to the 43 over-detentions which occurred between November 2002 and May 2005 in *Mortimer*.[4] In other words, whereas approximately 17 over-detentions per year occurred in the time period and categories addressed in *Mortimer*, approximately 77 annual over-detentions (459 over-detentions divided by 6 years) occurred per year between 2000 and 2005. However, when analyzed more closely, the distinction between the two figures is not significant.

The LASD processes tens of thousands of detainees every year. *See Mortimer*, 478 F.Supp.2d at 1179. Between November 2002 and May 2005, the LASD released nearly 51,000 persons, roughly 20,000 persons per year. *Id.* Neither party has submitted evidence in this case as to the total releases applicable to the pertinent period. However, if the Court applies the estimated number of annual over-detentions to the estimated number of annual releases, it appears that roughly 0.4% of persons released by LASD were over-detained, a percentage not readily distinguishable from the approximately 0.1% of over-detentions apparent in *Mortimer*.[5] Furthermore, plaintiff has provided no analysis in their papers as to why minimal numerical differences between *Mortimer* and this case are material or amount to an unconstitutional custom, policy, or practice on the part of defendants. *Id.* In the absence of evidence or argument, plaintiff leaves the Court to speculate why slightly different percentages of over-detention in this case amount to an unconstitutional practice, policy or custom under *Monell.* The numbers themselves do not bespeak unreasonableness.

Second, as it did in *Mortimer*, the Court also considers whether the incidence of over-detentions in LASD has increased or decreased in the years surrounding plain-

---

2. Each full packet contains a "supervisor's report" listing the cause of the over-detention and the remedial steps taken as well as an internal memorandum from counsel with a settlement recommendation. Though this evidence does not indicate the reasonableness of each over-detention, it does give the Court a rough idea of the potential for unreasonable over-detentions by the LASD.

3. Plaintiff claims that this number is actually 461, but this is a miscalculation, and the total number of settled claims is actually 459. (*See* Pl.'s Exs. 1–6.)

4. *Mortimer* was a class action in which the plaintiff represented "all LASD detainees who were not released within twelve hours of ei-

ther (a) the expiration of the applicable sentence or (b) a court-ordered release, and who have no outstanding releases, warrants, or holds." *Mortimer*, 478 F.Supp.2d at 1173. The over-detention class was also limited to persons whom the LASD categorized as eligible for release within the following categories: "not guilty," "case dismissed," "own recognizance," and "expiration of sentence." (Barrantes Decl. ¶¶ 23–25.). Here, by contrast, the Court looks to the total number of over-detentions that resulted in settled claims between 2000 and 2005.

5. 0.1% equals the rough number of annual over-detentions for the *Mortimer* class (17) divided by the approximate number of annual releases (20,000).

tiff's over-detention. *See Mortimer*, 478 F.Supp.2d at 1179; *see also Trevino*, 99 F.3d at 918. In support of its motion for summary judgment, defendants submit evidence from the LASD's Over-detention and Erroneous Release Database ("ODER"), which contains records of all detainees held in excess of twenty-four hours from the time a release is entered into the Automated Justice Information System ("AJIS"). (*See* Barrantes Decl.) Using the records contained in these systems, defendants provide the numbers of individuals over-detained from 1997 to 2004. Defendants' evidence indicates that for the years 1997, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, the number of over-detentions is 607, 495, 269, 249, 123, 81, 66, and 49, respectively. (Barrantes Decl. 15:16–20.) As the Court already noted in *Mortimer*, this evidence reflects that the number of over-detentions has dramatically decreased and demonstrates a significant downward trend. *See Mortimer*, 478 F.Supp.2d at 1179. Plaintiff has presented no evidence to counter such a conclusion.

Moreover, as stated earlier, any inference that an unconstitutional policy, practice or custom exists is weakened further because LASD has taken steps to reduce the number of over-detentions by implementing measures such as the "courthouse release" and "early release" programs. *See id.* at 1176 (describing the operation of the courthouse release and early release programs). In this case, defendants have submitted the declaration of Richard Barrantes, originally produced in the *Mortimer* action, who is presently assigned as the Commander of the LASD's Court Services Division and previously as Captain of the Inmate Reception Center ("IRC") of the Los Angeles County Jail. (Barrantes Decl. 8:5–8.)

Barrantes' declaration details the programs and measures LASD has taken to reduce the number of over-detentions during the past several years. First, Barrantes describes that at the time of the incarceration and release of the plaintiff in the *Mortimer* action in 2000, the LASD's computer system was not linked to the courts so inmates had to be transported back to the IRC along with their court paperwork following a court-ordered release. (*Id.* 10:18–20.) The processing of paperwork at IRC required "around-the-clock" work by LASD clerical personnel to accomplish the task of running security checks and obtaining valid authorization to release inmates. (*Id.* 10:20–25.) Subsequent to the release of plaintiff Mortimer in 2000, LASD and various courthouses linked their computer systems so that inmates who received release authorizations from court could be released directly from the courthouse. (*Id.* 10:25–28.) Today, the majority of inmates with court-authorized releases are released directly from the various courthouses in Los Angeles County. (*Id.* 13:23–25.)

Second, it was alleged by the *Mortimer* plaintiffs that over-detentions were caused in part because of a former IRC practice of waiting until the end of the day (until all of the various authorizations were received from the various courthouses) to begin processing an inmate's release paperwork. (*Id.* 13:3–6.) Barrantes testifies that by the time he had become Captain of the IRC in April of 2000, this practice no longer existed. (*Id.* 13:3–6.)

Third, Barrantes testified that LASD has implemented several initiatives with respect to personnel designed to reduce over-detentions, including among others: (1) a "mass campaign" to hire more clerks to process paperwork at IRC, (2) a 26-week training program for newly assigned employees, (3) daily testing of the pneumonic chutes to ensure delivery of paperwork to the release clerks, (4) the

establishment of a records jacket tracking system, and (5) the establishment of a policy requiring an employee assigned to receiving to visit booking twice per shift to review court paperwork delivered by transportation deputies. (Barrantes Decl. 17–18:17–3.)

Plaintiff, on the other hand, has submitted nothing to counter this evidence and made no suggestion of what specific aspects regarding LASD's methodology for handling over-detentions are flawed or could be changed.

Here, the Court finds that plaintiff has not met his burden to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Evidence that "is merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Taken together, the Court finds that defendants have shown that no triable issue of material fact exists with respect to the reasonableness of the Sheriff's implementation of the policies that resulted in over-detention. Accordingly, the Court grants summary judgment as to plaintiff's over-detention claim against defendants in their official capacity.

### b. *Individual Capacity Claim*

Defendants argue that there is no basis for asserting individual capacity claims against any of the defendants in this case under 42 U.S.C. § 1983 because there are no allegations of any personal involvement on their part in plaintiff's over-detention, or that Sheriff Baca or the other defendants had any direct contact with the plaintiff, or that they had any actual knowledge of the plaintiff's incarceration. Therefore, defendants contend that all individual capacity claims against defendants must be dismissed as a matter of law. The Court grants defendants' motion for summary judgment as to plaintiff's first cause of action against all defendants in their individual capacity.

Liability under § 1983 arises only upon a showing of personal participation by the defendant. *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir.1979); *see also Taylor v. List*, 880 F.2d 1040 (9th Cir.1989) (upholding judgment in favor of defendants, the Attorney General for the State of Nevada and the Director of the Nevada State Prison, where plaintiff failed to establish defendants' personal involvement in the alleged violations, or that they directed, participated in, or had knowledge of any alleged misconduct).

Section 1983 provides, in pertinent part, that "[e]very person who, under color of any statute ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983. A person "subjects" another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978). Alternatively, personal participation is not the only predicate for § 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury. *Id.*

Here, plaintiff presents no evidence that any of the defendants had any direct contact with plaintiff or had any actual knowledge of his incarceration. Nor does plaintiff include any evidence as to defendants' individual involvement in plaintiff's over-detention. As defendants demonstrate, the only allegations of individual involvement in the FAC are those asserted against defendant Baca:

Baca is liable in his individual capacity because he promulgated, personally knew of, and personally enforced the policy that actually caused plaintiff to be over-detained in his custody.

(FAC at ¶ 18.)

 In *Monell*, 436 U.S. at 658, 98 S.Ct. 2018, the Supreme Court held that respondeat superior may not serve as the basis for imposing § 1983 liability. Supervisory officials may not be held liable under § 1983 on the basis of respondeat superior, but only for their own wrongful behavior. *See* 1B Martin A. Schwartz and John E. Kirklin, *Section 1983 Litigation: Claims and Defenses* (3d ed.1997). When dealing with the liability of supervisory officials, the question is whether their own action or inaction subjected the claimant to the deprivation of federally protected rights. *Id.* Supervisors may be liable under § 1983 for their own culpable action or inaction in the training, supervision, or control of subordinates; for acquiescence in the constitutional injuries complained of; or for conduct showing a reckless or callous indifference to the rights of others, if such conduct led to the injury complained of. *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991). Moreover, liability under § 1983 arises only upon a showing of personal participation by the defendant. *Fayle*, 607 F.2d at 862. A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.

 As to plaintiff's individual-capacity claim against Sheriff Baca, plaintiff contends that Baca may be held liable for failing to provide proper supervision over the Sheriff's Department. In short, because Sheriff Baca runs the Sheriff's department, the plaintiff contends that he exerts sufficient supervision over the issues of this case to sustain the plaintiff's cause of action under § 1983.

Plaintiff cites *Larez*, 946 F.2d at 645–46, in which alleged victims of the use of excessive force during a search brought a civil rights action against police officers, the chief of police, and the city. *Id.* Plaintiffs alleged that the chief of police was responsible, in his individual capacity, for their constitutional deprivations because he condoned, ratified, and encouraged the excessive use of force. *Id.* The Ninth Circuit found that the district court had correctly instructed the jury that it could find Chief Gates liable in his individual capacity if he "set[ ] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict the constitutional injury." *Id.* at 646 (citing Reporter's Transcript, Decl. 1:5–6). The panel went on to note that "liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates ... for his 'acquiesce[nce] in the constitutional deprivations of which [the] complaint is made,' or for conduct that showed a 'reckless or callous indifference to the rights of others.'" *Id.* (internal citations omitted). In assessing whether the jury's verdict that the chief of police was responsible in his individual capacity for plaintiffs' constitu-

tional deprivations was plain error, the court found that:

> [The plaintiffs'] expert witness ... testified that, had he been in Chief Gates's shoes, he would have disciplined the individual officers and would have established new procedures for averting the reoccurrence of similar excesses in the future. Yet, neither step was taken by Gates. Instead, he signed a letter informing Jessie Larez that none of his many complaints would be sustained, thereby ratifying the investigation into the Larezes' complaint.

*Id.* at 646.

Here, plaintiff has produced no evidence establishing that Sheriff Baca "ratified" any prior or subsequent conduct taken with respect to plaintiff. In this case, there is no evidentiary basis for individual capacity liability, only conclusory allegations that Sheriff Baca and/or the other defendants allegedly ratified a continuing course of conduct involving the over-detention of inmates and forcible settlement of over-detention claims. Nor does the plaintiff provide evidence that Sheriff Baca or the other defendants "set[ ] in motion a series of acts by others" which he knew or should have known "would cause others to inflict the constitutional injury." *Johnson,* 588 F.2d at 743 (9th Cir.1978). Accordingly, the Court grants defendants' motion for summary judgment on plaintiff's first cause of action against defendants Baca, Waldie, and Mathers in their individual capacities.

### 2. *Involuntary Waiver of Claims*

Relying primarily on *Jones v. Taber,* 648 F.2d 1201 (1981), plaintiff also claims that his Fourth and Fourteenth Amendment rights were violated when defendants caused him to involuntarily waive his potential over-detention claims. *Id.* The Court finds that this claim fails as a matter of law.

In *Jones,* a county prisoner filed a 1983 suit against county officials based on a beating administered while he was incarcerated. *Id.* at 1202. The district court granted summary judgment for the defendants on the ground that Jones had, in exchange for $500 paid to him, signed a release in favor of all the defendants. *Id.* Reversing the grant of summary judgment, the Ninth Circuit held that defendants who rely on § 1983 releases signed by prisoners must meet the same standard of validity applicable to maritime releases. *Id.* Furthermore, the court found that the fact that Jones admitted that his signature on the release was "voluntary" was not controlling and that there were objective indications of coercive pressures and a lack of understanding precluding summary judgment. *Id.* at 1204.

The Court does not disagree that the same considerations used in evaluating the validity of a release as set forth in *Jones* are relevant to the question whether plaintiff's waiver of his over-detention claim in this case was truly voluntary. Indeed, *Jones* instructs that courts must be solicitous in ascertaining whether the release of a civil rights claim is valid. *See id.* at 1204–05 ("The federal solicitude for claimants under section 1983 is at least as great as that for seamen and in both situations the claimant's dependence on potential defendants requires the release to be examined with particular care. Because the indicia of reliability required of section 1983 releases must be no less unambiguous than those required of maritime releases, we hold that defendants relying on section 1983 releases signed by prisoners must meet the same standard of validity applicable to maritime releases.")

██ *Jones,* however, does not stand for the proposition, and the Court finds no independent authority elsewhere, that

there is an actionable claim under 42 U.S.C. § 1983 for causing an involuntary waiver of a civil rights claim. In other words, there is no freestanding constitutional right to be free of a coercive waiver.

The logic behind this conclusion is simple. If plaintiff were to bring an individual civil rights claim for his over-detention against defendants, defendants could raise the affirmative defense that the claim was barred by the waiver. Plaintiff would then argue that the waiver was involuntary. As an affirmative defense, it is defendants' burden to prove that plaintiff's waiver met *Jones'* standard of "voluntary, deliberate and informed." *See Jones*, 648 F.2d at 1203. If defendants did not meet this burden, in addition to damages for his over-detention, plaintiff would be entitled to attorneys' fees. Plaintiff could recover whatever additional attorneys' he incurred in arguing the waiver issue. But the underlying constitutional right at issue is not to be free of a coercive waiver, it is to be free when one is entitled to be released.

Therefore, plaintiff may not prevail on a separate claim that defendants violated his Fourth and Fourteenth Amendment rights by causing such a waiver. While the question whether the waiver meets *Jones'* standard of "voluntary, deliberate and informed," *see Jones*, 648 F.2d at 1203, would be relevant if defendants raised the affirmative defense that his over-detention claim itself is barred, this is not the case here. Accordingly, the Court grants summary judgment as to plaintiff's involuntary waiver claim.

B. *Count II: Conspiracy to Over-detain and to Coerce Settlement*

In Count Two, plaintiff claims that defendants conspired to over-detain him and cause him to involuntarily waive his over-detention claim. As the Court has already determined that plaintiff's involuntary waiver claim fails as a matter of law, it does not support the basis for a conspiracy claim. Therefore, the Court grants summary judgment as to plaintiff's claim that defendants conspired to coerce a waiver of his over-detention claim. Thus, the only remaining claim is whether defendants conspired to over-detain plaintiff. The Court grants summary judgment as to this conspiracy claim as well.

As to the over-detention claim, Count Two of the FAC alleges:

> [T]here was an agreement or understanding between or among all defendants to engage in the conduct alleged herein to be wrongful, and that there was the commission of an overt act in further of said conspiracy, to wit, illegally over-detaining the plaintiff.

> The legal foundations of this count are that defendants conspired to deprive the plaintiff of his due process right to liberty and to property . . . .

> The conspiracy was carried out by Baca and other Sheriff's department officers knowing that persons would not be released as ordered, and then continuing to follow the Sheriff's Department policy of failing to release persons, including plaintiff, from custody as ordered by judges . . . .

(FAC ¶¶ 21–22.)

 To prevail on a claim for conspiracy to violate one's constitutional rights under § 1983, the plaintiff must show specific facts to support the existence of the claimed conspiracy. *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989). The elements to establish a cause of action for conspiracy under § 1983 are: (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement.

**1170**

*Ting v. United States,* 927 F.2d 1504, 1512 (9th Cir.1991). In addition, there must be an agreement or meeting of the minds to violate his constitutional rights. *See Woodrum v. Woodward Co.,* 866 F.2d 1121, 1126 (9th Cir.1989). A formal agreement is not necessary; an agreement may be inferred from the defendant's acts pursuant to this scheme or other circumstantial evidence. *See United States v. Clevenger,* 733 F.2d 1356, 1358 (9th Cir.1984).

■ Here, plaintiff has presented no evidence to support the existence of an agreement or meeting of the minds between defendants, whether the agreement be specific or inferred from conduct, nor does he provide any evidence that the deprivation of his rights was the *result* of such an agreement. As such, plaintiff has not met his burden to designate specific facts showing that there is a genuine issue for trial as to the existence of a conspiracy between defendants. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Therefore, plaintiff cannot establish any basis for liability on his conspiracy claim against defendants in their individual capacities. In addition, since a municipal entity cannot conspire with itself, plaintiff's claim against defendants in their official capacity fails. Accordingly, the Court grants summary judgment in favor of all defendants as to Count II in its entirety.

C. *Counts III and IV: Racketeer Influenced and Corrupt Organizations Act Claims*

In Count III, plaintiff alleges that defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(a)-(c). (FAC ¶¶ 24–52.) In Count IV, plaintiff alleges that defendants conspired to commit violations of 18 U.S.C. §§ 1962(b)-(d). (FAC ¶¶ 53–54.)

■ The Racketeer Influenced and Corrupt Organizations Act ("RICO") prohibits, among other activities, the conducting of an enterprise's affairs through racketeering activity. 18 U.S.C. § 1962(c). A prima facie RICO case requires: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 620 (9th Cir.2004). Furthermore, there must be an injury to a specific business or property interest. *Diaz v. Gates,* 420 F.3d 897, 898 (9th Cir.2005). The plaintiff must also demonstrate that defendants engaged in at least two acts of racketeering activity as defined in 18 U.S.C. § 1961. *Bowen v. Oistead,* 125 F.3d 800, 806 (9th Cir.1997). Moreover, RICO requires as a threshold for standing an injury to "business or property." 18 U.S.C. § 1964(c). "Without a harm to a specific business or property interest—a categorical inquiry typically determined by reference to state law—there is no injury to business or property within the meaning or RICO." *Diaz,* 420 F.3d at 900.

■ Section 1962(d) prohibits anyone from conspiring to violate the provisions of 18 U.S.C. § 1962(c). Under § 1962(d), plaintiff must show that defendants objectively manifested their agreement to participate in a racketeering enterprise through the commission of two or more predicate crimes. *Baumer v. Pachl,* 8 F.3d 1341, 1346–47 (9th Cir.1993).

■ As to plaintiff's RICO claim, plaintiff asserts that he suffered an injury to a property interest in his right to a judicial proceeding. However, as this Court has previously noted, there is no property interest in federal judicial proceedings.[6] There are ample means within the judicial

---

6. *See* Court's March 1, 2007 Order Granting Defendants' Motion to Dismiss and Motion for Sanctions in *Thomas v. Baca,* CV 06–06981 at 14.

proceeding itself to vindicate any alleged improper conduct by a party, such as the coerciveness of a waiver of an over-detention claim. The Ninth Circuit has, however, held that a plaintiff may have a property interest in an economic opportunity or future wages. *See Diaz*, 420 F.3d at 900. While plaintiff alleges he has suffered lost wages and economic opportunities due to his over-detention, plaintiff has presented no evidence to support this assertion. Moreover, plaintiff has presented no evidence of a "pattern" of "racketeering activity" by any of defendant officers sued in their official or individual capacities.

As to plaintiff's RICO conspiracy claim, plaintiff has not presented any evidence of a "conspiracy" or "agreement" among defendants to over-detain him. At the summary judgment stage, the non-moving party has the burden to present evidence to show a genuine issue for trial. *E.g., Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Plaintiff has failed to produce any evidence on the requisite elements of both his RICO and RICO conspiracy causes of action (Counts III and IV). Accordingly, the Court grants summary judgment to all defendants on these claims in their entirety.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment in its entirety.

IT IS SO ORDERED.